IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF MISSISSIPPI
EASTERN DIVISION

LATANA WILLIAMS                                                              PLAINTIFF

V.                                                        CAUSE NO.: 1:09CV102-SA

CITY OF TUPELO, MISSISSIPPI                                                  DEFENDANT

<u>MEMORANDUM OPINION</u>

Defendant, City of Tupelo, Mississippi, has filed a Motion for Summary Judgment [51] seeking dismissal of Plaintiff's cause of action.  Defendant also filed a Motion to Strike Plaintiff's Untimely Supplemental Response [60].  After reviewing the motions, responses, rules and authorities, the Court denies Defendant's Motion to Strike and grants Defendant's Motion for Summary Judgment.

*Factual and Procedural Background*

Plaintiff, Latana Williams, was provisionally hired by the Tupelo Police Department (TPD) on January 3, 2008.  The hire letter, written by Chief of Police Harold Chaffin, conditioned her employment with the TPD on the "understanding that [Williams] successfully pass the psychological evaluation, drug screen and physical and a 10-week basic training class at the North Mississippi Training Center for the City of Tupelo."  Moreover, the letter declared, "On successful completion of the following evaluations [Williams] will be hired as a Police Officer I."  Plaintiff signed the letter to acknowledge that it was a conditional offer of employment, and that she must successfully pass all the prerequisites prior to being hired by the Tupelo Police Department.  The standards for "successful completion of law enforcement training" are controlled by the Mississippi State Board of Minimum Standards.  According to that Board, a certificate from the training academy evidences successful completion of that training facility.

Plaintiff began work on January 30, 2008, and successfully completed her psychological evaluation, drug screen and physical.  Plaintiff's ten-week basic training at the North Mississippi Training Center commenced March 16, 2008.  TPD is the host agency for the North Mississippi Law Enforcement Training Center. This Training Center is a regional police academy, in which several law enforcement entities from the State of Mississippi send their officers in training.  Brian Brown was the Director of the Training Academy for the pertinent time period, and Scott Speaks and Steven Rogers were full-time instructors.[1]  Under the Minimum Standards, the Academy graded each cadet on academic performance, physical fitness, firearms qualifications, defensive driving techniques, defensive tactics, first aid, and cardiopulmonary resuscitation.

In the March 2008 class, Plaintiff was one of seventeen cadets: three African American men; the Plaintiff, an African American woman; and thirteen Caucasian men.  Only nine cadets - all Caucasian males - completed the ten-week training course.

During physical training, Speaks accused Plaintiff of being "weak, sorry, lazy and unable to keep up with the men."  Speaks told Plaintiff that she would not pass the Academy, and he would do everything he could to get rid of her.  Another cadet, Stanley Earl Lee, testified that Speaks told Plaintiff that she would never be a part of his family, and that if she did make it through the Academy, that him and his "brothers" would not back her up.  Plaintiff also alleges that Speaks told another cadet that she thought since she was black and a female that she could not get kicked out of the Academy, and he was going to prove her wrong.  Despite the verbal disparagement, Plaintiff was

_____

[1]Steven Rogers was a full-time instructor from 2006 through December of 2008.  At the time of his deposition, Scott Speaks had been an Academy instructor for five years, the first two as a part-time instructor and the remainder as a full-time instructor.

2

passing all portions of the Training Academy the first six weeks.[2]

Firearms training began in week seven at the Academy. Plaintiff acknowledges that initially, she had problems with her shooting technique. In fact, of the four qualification courses, Plaintiff's scores ranged from fifty-five percent to sixty-two percent. The Board of Minimum Standards has established a certain percentage and average scores that each cadet must have in firearms qualifications courses in order to successfully complete that portion of the training program. Those Standards require at least a seventy-five percent shooting average over the four courses and on the individual courses.

Scott Speaks informed Major Ronnie Thomas, the TPD official over the training academy, that Plaintiff was struggling with her firearms qualification. Major Thomas testified that the Tupelo Academy had never not been able to get a candidate's shooting in the passing range. Speaks maintains that he was told to do what he had to do to get her qualified in firearms.

For firearms instruction, Plaintiff had over seven different instructors work one-on-one with her to pass the course. Each remediation involved shooting over fifty rounds. Brown admits that Plaintiff showed improvement while working with each instructor but digressed in a group setting. Plaintiff was issued a different gun with a shorter grip, which she was able to control better, and she did eventually pass under the supervision of an instructor from an outside state agency.

Driver training was conducted during the next week. Cadets used cars provided by their own agency for driver training. Plaintiff asserts that she notified TPD that she needed a vehicle for

_____

[2]Defendant argues that Plaintiff was deficient in her physical training, and in particular, lacked sufficient motivation. There is no record evidence that Plaintiff's physical training was a factor in her termination. Moreover, the evidence does show that Plaintiff received a score above that required by the Minimum Standards. Thus, Plaintiff's physical training is not an issue.

training, but one was never provided.  Thus, she had to use an Academy car that had to be jumped

off in order to start and was in bad mechanical condition.  Plaintiff was unable to complete the

practice runs within the parameters set by the Minimum Standards Board.  Thus, Brown and Speaks

determined that remediation was necessary for Plaintiff.   Plaintiff received twenty different

remediations lasting from fifteen minutes to one and a half hours each.  Defendant contends that

because of the excessive number of remediations, Plaintiff technically failed the driving portion

according to the state minimum standards.  After being allowed to use another cadet's car and

receiving a few final remediations, Plaintiff did pass the day portion of the course.  Plaintiff was

never able to pass the night course, however.  The Standards allow a certain number of remediations

for each cadet, if needed.   Brian Brown contacted the Board to inquire as to what constituted a

"remediation."  The Board informed Brown that it was in his discretion.  Brown testified that he then

considered one instructor working on-on-one with a cadet to be one remediation.

   After Plaintiff's difficulties in the driving course, and mindful of her struggles in the firearms

portion of the training, Director Brown approached Chief Chaffin with the Academy's concerns that

Plaintiff was not able to perform the skills necessary to be a police officer.  Chaffin requested that

the instructors at the Academy brief the Command Staff[3] of TPD with that information, and a

meeting was set up for later that week.  The Academy instructors relayed to the Command Staff that

Plaintiff was having trouble meeting the minimum requirements set by the State of Mississippi in

firearms and driving.  Because of this, the Academy could not recommend that she be certified by

the Academy.  The Command Staff agreed that Plaintiff should have the opportunity to resign or be

---

[3]The Command Staff of TPD includes Major Ronnie Thomas, Major Jackie Clayton,
Major Anthony Hill, and Chief Chaffin.

terminated.  On May 16, 2008, Plaintiff refused to resign and was terminated.

Plaintiff asserts that she was discriminated against based on her race and sex.  Defendant filed a Motion for Summary Judgment seeking dismissal of her claims. Plaintiff responded on the due date and one day later, filed a supplemental response which included two additional exhibits. Defendant filed a Motion to Strike.  No leave of court was requested to file the out-of-time supplement.  Defendant requests the additional argument and exhibits be struck. No substantial prejudice will result to the Defendant by accepting the Supplement. Thus, Defendant's Motion to Strike is DENIED.

*Summary Judgment Standard*

Summary judgment is warranted under Rule 56(c) when evidence reveals no genuine dispute regarding any material fact, and that the moving party is entitled to judgment as a matter of law. FED. R. CIV. P. 56(c). The party moving for summary judgment bears the initial responsibility of informing the district court of the basis for its motion and identifying those portions of the record it believes demonstrate the absence of a genuine issue of material fact. Celotex Corp. v. Catrett, 477 U.S. 317, 323, 106 S. Ct. 2548, 91 L. Ed. 2d 265 (1986). The non-moving party must then go beyond the pleadings and designate "specific facts showing that there is a genuine issue for trial." Id. at 324, 106 S. Ct. 2548. Conclusory allegations, speculation, unsubstantiated assertions, and legalistic arguments are not an adequate substitute for specific facts showing a genuine issue for trial. TIG Ins. Co. v. Sedgwick James of Wash., 276 F.3d 754, 759 (5th Cir. 2002); SEC v. Recile, 10 F.3d 1093, 1097 (5th Cir. 1997); Little v. Liquid Air Corp., 37 F.3d 1069, 1075 (5th Cir. 1994) (en banc).

In reviewing the evidence, factual controversies are to be resolved in favor of the nonmovant, "but only when . . . both parties have submitted evidence of contradictory facts." Little, 37 F.3d at

1075.  In the absence of proof, the court does not "assume that the nonmoving party could or would

prove the necessary facts." Little, 37 F.3d at 1075.

*Discussion and Analysis*

Since Williams does not allege any direct evidence of discrimination, we apply the familiar

McDonnell Douglas burden-shifting analysis. Moore v. Reeves County, 360 F. App'x 546, 548-49

(5th Cir. 2010) (citing McDonnell Douglas Corp. v. Green, 411 U.S. 792, 802, 93 S. Ct. 1817, 36

L. Ed. 2d 668 (1973)). "To survive summary judgment under McDonnell Douglas, the plaintiff must

first present evidence of a prima facie case of discrimination." Davis v. Dallas Area Rapid Transit,

383 F.3d 309, 317 (5th Cir. 2004). If the plaintiff presents a prima facie case of discrimination, then

an inference of discrimination arises, and the burden shifts to the employer to articulate a legitimate,

nondiscriminatory reason for the underlying employment action. Id.

Plaintiff alleged discrimination based on race and sex in her Equal Employment Opportunity

Commission Charge.  However, in the Complaint filed in this action, she only alleged race

discrimination.  Defendant filed the Motion for Summary Judgment arguing for dismissal of

Plaintiff's race and sex discrimination claims.  Plaintiff responded against dismissal of her race and

sex discrimination claims.  Thus, the Court will address both race and sex discrimination claims

together as the same facts and analysis applies to both. See Jefferies v. Harris County Comm. Action

Ass'n, 615 F.2d 1025, 1030 (5th Cir. 1980) (noting the liberal federal concept of notice pleadings

that encompass an EEOC charge).

Defendant concedes that Plaintiff is a member of a protected class, and that she was

ultimately dismissed.  However, Defendant asserts Plaintiff cannot prove that she was qualified for

the position or treated less favorably than other similarly situation employees outside the protected

6

group.

Plaintiff acknowledges that her position at TPD was conditioned upon her completion of the ten-week basic training course.  Plaintiff did not complete the course or receive a certificate. Therefore, according to the Board of Minimum Standards, Plaintiff is not qualified for the police officer position with TPD.  Even assuming she was qualified, however, Plaintiff has not presented a genuine issue of material fact as to race or sex discrimination.

Plaintiff asserts that at the Training Academy, she was treated more harshly by the instructors, particularly Scott Speaks, because of her race and sex.  Indeed, Plaintiff contends that the Academy staff "convinced" the other African American men to quit.  The record is devoid of evidence of this contention.  Cadet Henry Boyd, one of the African American men in the same training class as Plaintiff, left within the first week of training.  Boyd testified that he quit because "[t]hey  wanted a whole lot more than I was willing to give."  Indeed, Boyd attempted to quit and was convinced by one of the Academy staff to "stick it out."  Boyd went back out for physical training and quit again.  When asked if he was treated differently than any of the other cadets, he stated, "I feel like they didn't love nobody."  Cadet Hall, another African American male, did not return after the second week due to an illness.  Cadet Willis, the third African American man, quit citing the fact that he was not physically ready for training.  There is nothing in the record to indicate that any of the three African American men were "convinced" to quit.

Moreover, Defendant produced affidavits and a roster of African American cadets who entered and passed the North Mississippi Law Enforcement Training Academy.  Hope Jones, an African American female completed the Training Academy in December of 2007.  She stated that "[d]uring my time at the academy, I did not think any of the instructors singled out any individual

7

because of their race or gender."   Others who echoed Hope Jones' sentiment include: Phillip Jackson, an African American male, who completed training at the North Mississippi Law Enforcement Training Academy in 2004; Deandre Eiland, an African American male, who completed the Academy in 2007; Tammy Thompson, an African American female who was certified by the Tupelo Training Academy in 2007; and Oscar Haynes, an African American male who completed training in 2006.  Since 2004, TPD has hired eight African Americans, including Latana Williams.

Plaintiff contends that Instructor Speaks made comments to her that he did not make to the Caucasian cadets.  She asserts that Speaks told her that she was not going to pass the Academy, so she might as well quit; that she would never be part of his family; that Williams did not deserve to be at the Academy; that she was holding up the training; that she had no mental toughness; that she was pathetic, and he hoped she would not return on Sunday.  Plaintiff also claims Speaks made a comment to another cadet regarding Plaintiff's belief that she could not get kicked out of the Academy because she was an African American female.  Plaintiff also alleges that Speaks warned her that if she did make it through the Training Academy, that he and his brothers would not back her up.

Scott Speaks explained that he makes those statements to every non-performing cadet regardless of race or sex in order to motivate them to perform.  He stated that these statements expose cadets to a controlled stressful environment to mimic the stress of the streets.  Speaks admits to making most of the statements alleged by Plaintiff, aside from the "brothers" comment and the

comment allegedly made to another cadet.[4]  Cadet Yoakum stated that Speaks spoke to all the cadets in that way.  He noted that "it was no one person being specified and picked out."  If Scott Speaks only made those comments to her, for purposes of this evaluation, Plaintiff may have been treated differently than other similarly situated cadets outside her protected class.

Plaintiff has satisfied the fourth prong of the <u>McDonnell Douglas</u> framework by showing that she was replaced by someone outside her protected class.  Jason Whitlock, a white male, was hired in Plaintiff's position by Defendant after her termination.  Thus, Plaintiff has met her prima facie burden.

The Defendant offers as its legitimate, non-discriminatory reason for her termination that Plaintiff did not pass the minimum standards to be certified as a law enforcement officer.  In particular, Plaintiff may have "technically" passed the firearms and driver training, but she did so with extensive remediation, such that the instructors at the Academy would not certify her as satisfying the minimum standards. Aside from the failure to complete minimum standards in firearms and driving, the Academy instructors noted that Plaintiff was deficient in "scenario training." According to the instructors and cadets, Plaintiff was engaged in a pursuit scenario in which the car she was pursuing stopped, two "suspects" got out of the car and commenced shooting "simunition" weapons at her.  Speaks testified that Plaintiff's reaction was "absolutely frightening" and a "complete failure."  Other cadets testified that the pursuit was "eye opening" and hard to forget.

Speaks declared that he did not believe Williams could pass the firearms portion of training

---

[4]Both the cadet Plaintiff alleges told her about Speaks' comment and Speaks himself deny that a comment was ever made concerning Plaintiff's ability to fail the Academy because she was an African American female.

again if given the chance to attempt it on her own.  He stated, "She requires constant supervision and instruction to successfully operate her firearm.  This cadet is a severe liability to the City of Tupelo and a great risk to herself, other officers, and the citizens she will be asked to protect." Major Ronny Thomas noted that after Brown and Speaks' assessment of Williams and their opinion that Williams would never be able to successfully complete emergency driver training, he, along with the other Majors, recommended to Chief Chaffin that Williams be dismissed.

Defendant has offered a sufficient legitimate non-discriminatory reason for Plaintiff's dismissal. "If the employer is able to state a legitimate rationale for its employment action, the inference of discrimination disappears and the plaintiff must present evidence that the employer's proffered reason was mere pretext for racial discrimination." Moore, 360 F. App'x at 548 (quoting Davis, 383 F.3d at 317).

"On summary judgment, [at the pretext stage], the plaintiff must substantiate his claim of pretext through evidence demonstrating that discrimination lay at the heart of the employer's decision." Price v. Fed. Express Corp., 283 F.3d 715, 720 (5th Cir. 2002). "To carry this burden, the plaintiff must produce substantial evidence indicating that the proffered legitimate nondiscriminatory reason is a pretext for discrimination." Laxton v. Gap, Inc., 333 F.3d 572, 578 (5th Cir. 2003). "Evidence is substantial if it is of such quality and weight that reasonable and fair-minded men in the exercise of impartial judgment might reach different conclusions." Id. at 579 (quotation marks omitted).

Plaintiff alleges the following as evidence of pretext: the fact that no other person had ever failed the Academy; improper grading of her firearms qualification courses by Scott Speaks and the use of the "second clock" to time her driving course;  the malfunctioning Academy car; and

disparities she perceived in the her treatment versus treatment of other cadets.

First, Plaintiff argues that her being the first failed cadet is evidence of pretext.  As noted above, other African American woman have completed the Academy and received a certificate. Plaintiff's failing the Academy is not evidence that Defendant discriminated against her on the basis of either her race or her sex.

Steven Rogers recommended to Chief Chaffin that Plaintiff not pass the Academy

based off the fact that the large part about being a cop is being able to operate under stress, being able to think and make split-second decisions.  That's the world in which a cop operates.  And after exposing Latana Williams to various scenarios to where she had to make split-second decisions or there was a lot of stress, whether it be, you know, like I said, in the scenarios or on the firearms qualification range, she did not meet the grade.

Bobby Carnathan testified that in his professional opinion as an instructor, "I could not pass Ms. Williams based on my observation of her driving ability . . . I, as my professional opinion, could not see where she would be capable performing those on the street by herself without someone with her."

Director Brian Brown noted that he's been "assisting in training since '98," and he's not aware of any individual cadet having such extensive remediation.  Brown avowed that considering officer safety and the public's safety, his professional opinion of her performance "dictated that I inform my supervisors."  Brown wrote out his reasons for the Command Staff.  That memorandum noted:

As Director of this Training Center, I do not feel comfortable allowing [Williams] to graduate this class even though she has, on paper, passed the program.  It is my opinion that a cadet can do bare minimum and still pass the state standards.  In Williams's case, however, I feel she has performed under these minimums.  I think that Williams could perform up to standards if she had an instructor assisting her while at work, but this is neither feasible nor allowed.  Williams must be able to

11

perform on her own and in my professional opinion, cannot do so.

Chief Chaffin testified that keeping Williams on at TPD

> would be a tremendous liability and disservice to the citizens of Tupelo, a disservice
> to the officers that Ms. Williams would have to work with, and more so than that, a
> disservice to her for me to put her out on the street and her not able to fire a firearm
> effectively and drive effectively and act in bad situations, have a reaction.

Cadet Jason Clingan was asked, "was there ever any indication that any instructor did not want

[Williams] to pass that course?" He answered, "No. No. They gave her chance after chance after

chance, different instructors to ride with her, let me ride with her, you know." Another cadet, Stanley

Earl Lee testified that "[s]he was expected to do the same things that [the men] were doing," and that

based on the instructors attitude at the Training Academy, "I would say she was mistreated as much

as everybody else." Lee further declared, "I wouldn't say they treated her any differently [than other

members of the class]. They pushed her just as hard as they pushed everyone else."

Second, Plaintiff argues that Scott Speaks improperly graded her firearms qualification

courses. Plaintiff's only evidence of this contention is that she never passed her firearms

qualification when Speaks graded her target, but she did pass when a remediator not associated with

the Academy graded her target. Even if Speaks were mis-grading Plaintiff's targets, this alone is not

sufficient to establish racial or sexual discrimination pretext.

Plaintiff also argues that she was discriminated against on the basis of the "second clock"

grading on the driving course. Passing the driving course consisted of navigating through the course

without hitting a certain number of cones, all within a designated time. During one qualification run

on the driving course, Brian Brown held the stopwatch and told Plaintiff that she passed within the

time limits prescribed by the Minimum Standards. Brown testified that another instructor

approached him after Plaintiff's run and pointed out disturbed cones that Brown had not noticed and said that by the time kept on a second watch, Plaintiff did not pass the qualification run by one second.  Brown testified that he made the decision that due to her difficulty in passing the driving course and the twenty remediations she received on the courses, that he would go by the second watch and deem her not to have passed the driving course.  Plaintiff contends this is pretext of race and sex discrimination.  This unsubstantiated assertion is not proof of animus or discriminatory intent.   Plaintiff's second clock theory does not make it more likely that Defendant discriminated against Plaintiff on the basis of her race or sex, therefore, it is not competent evidence of pretext.

Third, Plaintiff argues that having to use the Academy's malfunctioning car is evidence of pretext.  Plaintiff was allowed to use another car to complete the driving course and still could not pass the night driving course.  Evidence that the Academy car malfunctioned is not evidence of any racial or gender bias on the part of Defendant.

Fourth, Plaintiff states that she was treated differently than other cadets based on her race and/or sex.  In particular, Plaintiff contends "quit forms" were placed on her desk after every break; she was constantly encouraged to quit; and her remediations were documented but others were not. Plaintiff has presented nothing more than unsubstantiated assertions and conclusory allegations. None of Plaintiff's contentions show any racial or gender bias by Defendant.

*Conclusion*

Plaintiff has failed to put forth any evidence that Defendant's legitimate, non-discriminatory reason for terminating her was pretextual.  Thus, Plaintiff's Title VII race and sex discrimination claims are dismissed.

SO ORDERED, this the <u>16th</u> day of August, 2010.

**/s/ Sharion Aycock**
**U.S. DISTRICT JUDGE**
